THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERRY MOORE, Defendant-Appellant.

Second District    Nos. 2—92—1266, 2—92—1267 cons.

Opinion filed March 8, 1994.

G. Joseph Weller, Steven E. Wiltgen, and Patrick M. Carmody, all of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE PECCARELLI delivered the opinion of the court:

Defendant, Jerry Moore, was convicted following a jury trial of armed robbery (Ill. Rev. Stat. 1991, ch. 38, par. 18—2(a) (now 720 ILCS 5/18—2(a) (West 1992))) in case No. 92—CF—170. Defendant also pleaded guilty to armed robbery in case No. 92—CF—168. Following a combined sentencing hearing, the court sentenced defendant to consecutive terms of 25 and 10 years' imprisonment. Defendant appeals, contending that the sentences were unduly harsh given his youth, lack of criminal history, work record, demonstration of remorse, and supportive family.

At the trial of case No. 92—CF—170, Thomas Gscheidle testified that he was the manager of the Burger King restaurant in Gurnee. He was at work at about 6:30 p.m. on January 19, 1992, when the telephone rang and he went into the office to answer it. After he hung up the phone, he felt a cold, round object on his neck behind his ear. A voice commanded him to open the safe. The voice told him four or five times to open the safe or he would be dead. At this point he could not see the person making the demand.

After Gscheidle opened the safe, the voice asked him if he had a bag. Gscheidle found a white canvas coin bag. The person spotted a blue pouch and asked Gscheidle about it. Gscheidle explained that it contained the paper cash, and the voice ordered him to place it in the canvas bag.

When the voice ordered Gscheidle outside the office, he finally got a look at the robber. He was wearing black pants, a dark jacket, and a dark mask. Gscheidle estimated that this individual was 6 feet 3 inches tall. With the gun pointed at Gscheidle's back, the robber ordered Gscheidle to walk to the front of the store. There the manager noticed his employees lying on the floor. He was ordered to open the cash register drawers. As he did so, he saw a second robber

standing by the french fryer. This person was between 5 feet 8 inches and 5 feet 10 inches tall. The second robber told Gscheidle to remove the cash from the drive-through window register. While Gscheidle was doing this, the first robber walked to the front doors and stood in the lobby. Gscheidle was then ordered to give the money to the man by the french fryer. The latter stuffed the money in his pockets.

Gurnee police sergeant Glen Nelson responded to a call about the robbery. As he arrived he saw two men running from the east door of the Burger King through the parking lot. He chased the taller man, who dropped a white canvas bag while he was running. The man eventually jumped a fence and escaped.

Eric Verden testified that he lives in an apartment complex in Gurnee about a mile and a half from the Burger King. At 7:30 or 8 p.m. on January 19 he stepped outside to get some things from the back of his Oldsmobile Cutlass. As he reached into the backseat, he heard a noise. He stood up and confronted a man about 6 feet 5 inches tall and wearing a brown ski mask. Verden scanned further down the man's body and saw that he was pointing a gun at him. The man demanded the key to the ignition. Verden protested that he did not have it. After unsuccessfully attempting to start both the Oldsmobile and Verden's Jeep Cherokee, the two men entered Verden's apartment. The man with the gun continued to point it at Verden. After noticing that the gunman appeared to be cold and that his clothes were wet, Verden offered the gunman coffee and dry clothes. Eventually they went back outside and the gunman demanded that Verden drive him to an address in Waukegan. In court, Verden opined that defendant matched the physical dimensions of the person he saw on January 19, 1992.

Waukegan Detective Michael Donnenwirth interviewed defendant concerning the Burger King robbery. Defendant stated that he had been riding around with Stanley Belton and Troy Jackson when they decided to rob a Burger King. He said that he did not really want to do it, but went along with the plan. Defendant had a .38-caliber handgun. As they approached the Burger King, he gave the gun to Belton. Belton went in first and defendant and Jackson followed. Defendant described his escape, stating that he put his hand under his coat to make it look like a gun in order to get a ride from Verden. Donnenwirth identified defendant's written statement.

Troy Jackson testified that defendant is his cousin. They got together after Jackson's release from prison in October 1991 and often played basketball and "hung out" together. Jackson stated that he pleaded guilty to armed robbery in exchange for a sentence of 25 years. The plea agreement also required his truthful testimony.

Jackson said that on January 19 he, Belton, and defendant were riding around together and developed a plan to rob the Burger King. Jackson testified that defendant was the one who held the gun to the manager's head and obtained the canvas bag full of money. Jackson estimated Belton's height at about 5 feet 8 inches. Jackson said that he is approximately a half-inch taller than Belton. Defendant is 6 feet 3 inches tall.

Defendant testified at trial that he was at home on January 19 when Jackson and Belton picked him up. They began driving toward Gurnee because Jackson's girlfriend lived there. As they drove past the Burger King, Jackson suggested that they rob it. Jackson parked the car by a shopping center and he and Belton changed into darker clothes and began walking toward the restaurant. Defendant tried to dissuade the others from committing the robbery, but, after they argued for awhile, Belton snatched the gun away from him. Belton and Jackson then entered the Burger King. Defendant walked with them, but stopped at the door. He remained in the lobby between the sets of double doors. Back in the parking lot, Belton gave defendant the gun because Belton had the money. He jumped over a fence and ran to an apartment complex, where a man gave him a ride.

The jury found defendant guilty of armed robbery. The court entered judgment on the verdict and continued the cause for sentencing.

In case No. 92—CF—168, defendant pleaded guilty to armed robbery. The factual basis for the plea was that on January 12, 1992, defendant or someone he was legally accountable for, while armed with a gun, took money from the presence of William Seibel, the manager of a Pizza Hut, by the threat of the imminent use of force. The court accepted defendant's plea and continued the cause for sentencing.

At the sentencing hearing, the State presented in aggravation evidence of two additional restaurant robberies in which defendant was involved. Apparently the State agreed to drop the charges concerning these robberies in exchange for defendant's guilty plea in 92—CF—168.

Defendant's mother, Minnie Moore, testified that she raised five children by herself because defendant's father was not around. Defendant was never a problem while growing up. She described him as a follower who had fallen in with "the wrong crowd." Defendant's grandparents and stepfather also testified that defendant was basically a follower who never got in trouble while growing up.

Defense counsel stated that Rachel Peet, the mother of defendant's son, wished to tell the court that defendant was a good father who did support her and her son whenever he could.

In addition to this evidence, the court considered the presentence report, which, with corrections defense counsel presented orally, contains the following information. Defendant was born March 16, 1973. Thus he was 18 at the time of the offenses and 19 at the time of trial. He has no juvenile record, but had one misdemeanor conviction of battery and three convictions of operating an uninsured vehicle. Defendant was on probation for the battery conviction at the time of the instant offenses.

Defense counsel stated that defendant had "withdrawn" from Waukegan High School due to poor attendance. His only employment consisted of working as a teacher's aide at Waukegan High School at a salary of $20 per week and an unspecified (apparently part-time) position at the VA Hospital. The presentence report states that defendant has never paid child support for his son.

Defendant made a statement in allocution, saying that he was sorry for what he had put his family through. He stated that he desired to further his education while in prison so that upon release he could get married and take care of his son.

In imposing sentence, the court considered in mitigation defendant's "substantial degree" of remorse, his supportive family, and his relative lack of criminal history. The court considered in aggravation that defendant participated in four armed robberies, three in which defendant brandished a weapon which threatened numerous people in the restaurants. The court imposed consecutive terms of 10 years' and 25 years' imprisonment.

Defendant filed a motion to reconsider his sentences in which he argued, *inter alia*, that the court failed to state specifically a finding that consecutive sentences were necessary to protect the public from future conduct by defendant. (See Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—4(b) (now 730 ILCS 5/5—8—4(b) (West 1992)).) In denying the motion, the court stated:

> "As to the admonishment regarding protection of the public, I think that, of course, is paramount in your mind when you are sentencing somebody to the department of corrections for the term involved here."

Defendant filed a timely notice of appeal.

Defendant contends on appeal that the trial court abused its discretion both in setting the lengths of the sentences and in making them consecutive. Defendant argues that the court failed to give adequate weight to the mitigating evidence, in particular defendant's age, his lack of criminal history, his demonstrated remorse, his history of employment, and his supportive family.

The imposition of a sentence is a matter of judicial discretion,

and the standard of review to determine whether a sentence is excessive is whether a trial court abused that discretion. (*People v. O'Neal* (1988), 125 Ill. 2d 291, 297-98; *People v. McCain* (1993), 248 Ill. App. 3d 844, 850.) This is because the trial judge is normally in a better position than a court of review to consider such factors as credibility, demeanor, general moral character, mentality, social environment, habits, and age, and accordingly determine the punishment to be imposed. (*O'Neal*, 125 Ill. 2d at 298; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) Therefore, a trial court's sentencing decisions are entitled to great deference and weight. *Perruquet*, 68 Ill. 2d at 154; *McCain*, 248 Ill. App. 3d at 850.

The trial court here did not abuse its discretion. The facts concerning the offenses themselves demonstrate the propriety of a severe sentence. Defendant admitted participating in at least four armed robberies. In at least three he displayed a gun. All occurred in restaurants filled with customers. Gscheidle testified about the methodical manner in which the Burger King robbery was perpetrated. In addition, defendant facilitated his escape from Burger King by taking a hostage. All of these offenses occurred while defendant was on probation for a battery conviction.

Furthermore, contrary to defendant's statement to police and his trial testimony, the evidence was sufficient to show that defendant was the primary perpetrator of the Burger King robbery. Codefendant Jackson stated unequivocally that defendant was the one who held the gun to Gscheidle's head and demanded the canvas bag. Gscheidle himself identified the gunman as being approximately 6 feet 3 inches tall. Sergeant Nelson testified that the tall robber was the one who dropped the canvas bag in the alley. Verden described the man who held him hostage as being about 6 feet 3 inches tall. Jackson testified that both he and Belton are less than six feet tall. Therefore, the evidence establishes that defendant was the gunman at the Burger King and not merely a passive participant.

On appeal, defendant continues to attempt to minimize his culpability for the series of events on January 19, 1992. While admitting to a hostage taking to facilitate his escape, he contends that the hostage taking was "benign," noting that he engaged in rapport with Verden, never actually threatened him verbally, and took the clip out of the gun when Verden asked him to. These considerations do not alter the fact, however, that defendant demanded a ride from an innocent bystander while pointing a gun at him the entire time. The evidence shows that even after defendant removed the clip he kept both the gun and the clip close at hand and kept the gun in plain sight in his hand.

Similarly, the other evidence presented at the sentencing hearing is not sufficiently mitigating to warrant disturbing the trial court's sentences. Although defendant had no juvenile record and no previous felony convictions, the record shows that defendant committed five serious offenses in a relatively short time since reaching the age of majority. The record also demonstrates that defendant "withdrew" from high school, had never held a full-time job, and was not supporting his one-year-old son.

The record demonstrates that the trial court considered the mitigating evidence that defendant grew up without a father, had a relatively slight criminal history, and a supportive family structure. Defendant was convicted of two Class X felonies. He could have received a total of 60 years' imprisonment. The court's sentence of slightly more than half that, while lengthy, reflects consideration of the mitigating evidence. The length of the sentences was not an abuse of discretion.

Defendant also contends that the court erred in making the sentences run consecutively. Section 5—8—4(b) of the Unified Code of Corrections provides as follows:

> "The court shall not impose a consecutive sentence *** unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—4(b) (now 730 ILCS 5/5—8—4(b) (West 1992)).

The supreme court in *People v. Hicks* (1984), 101 Ill. 2d 366, held that the trial court is not required to recite the language of the statute in determining that consecutive sentences are warranted. Rather, the record must show only that " 'the sentencing court is of the opinion that a consecutive term is necessary for the protection of the public.' " *Hicks*, 101 Ill. 2d at 375, quoting *People v. Pittman* (1982), 93 Ill. 2d 169, 178.

Here, the court's statement at the hearing on the motion to reconsider the sentences cures any arguable deficiency in the record concerning the trial court's belief that consecutive sentences were necessary to protect the public. While consecutive sentences are to be used sparingly (*People v. Dorosz* (1991), 217 Ill. App. 3d 1016, 1020), the trial court's comments show that it felt such sentences were necessary in this case. The evidence outlined above establishes that the court did not abuse its discretion in so finding.

174

For the foregoing reasons, defendant's convictions and sentences are affirmed.

Affirmed.

DOYLE and COLWELL, JJ., concur.